# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO.: 5:08-CV-00111-TBR

WAYNE HACK                                                                                          PLAINTIFF

v.

C-PLANT FEDERAL CREDIT UNION, et al.                                                DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon Defendant C-Plant Federal Credit Union's Motion for Summary Judgment (DN 36). Plaintiff has filed a response (DN 44). Defendant has filed a reply (DN 45). For the following reasons, Defendant's motion is GRANTED.

Also before the Court is Defendant Mark Atwood's Motion for Summary Judgment (DN 37). Plaintiff has filed a response (DN 39). Defendant Atwood has filed a reply (DN 43). For the following reasons, Defendant Atwood's motion is GRANTED.

## BACKGROUND

Plaintiff, Wayne Hack, was employed in the position of Senior Vice President of Asset Management and Recovery at C-Plant Federal Credit Union ("C-Plant") until his termination on May 23, 2008. He was a member of the C-Plant Senior Management Administrative team and was in charge of the collections department. As a member of senior management he was familiar with C-Plant's Policies and Procedures Manual. Any updates to these policies took place at board meetings, which Hack attended.

An internal audit was conducted by Carrie Childers, C-Plant's Compliance Officer, in October of 2007. This audit concerned "rolled due dates" which are used if a member is having temporary problems making loan payments in order to extend the due date of the loan. The audit was conducted to ensure the best practice procedures and policy guidelines were being followed and

was prompted by an external audit conducted by Financial Standards Group which identified a large number of rolled or adjusted due dates.

The National Credit Union Administration ("NCUA") conducted an examination of C-Plant in March, 2008, by and through its examiner, Felicia Shepard. The NCUA insures credit unions, much like the FDIC does for regular banking institutions. The NCUA performs an examination of the credit union each year to eighteen months to be sure the credit union is in compliance with NCUA rules and regulations and is operating in a safe manner.

During the second week of March, 2008, Hack learned he needed to undergo hernia surgery and informed C-Plant's Senior Management team, CEO Mark Atwood and CFO Paul Adams, that he would need to be off work for two to six weeks. Hack also informed Jennifer Brayboy, C-Plant's Human Resources Officer and Pam Cline, C-Plant's Senior Vice President of Lending that he would be on leave for a period of time due to the hernia surgery. Hack did not state that he wished to take leave pursuant to the Family Medical Leave Act ("FMLA"). Hack had seventy seven days of unused sick leave at the time he began his medical leave. Hack left for medical leave on May 13, 2008.

Near the same time as Hack took his medical leave, Shepard brought to the attention of C-Plant management the rolling due date issue, as well as issues of insider abuse. Shepard found these actions were violations of NCUA policy. Hack and CEO Mark Atwood were highly criticized by Shepard for their supervision of C-Plant operations. Shepard also found specific problems with actions taken by Barbie Kittle, Branch Manager Tammy Webb and Loan Officer Nerissa Collins.

On May 15, 2008, Hack was visited at his home by Paul Adams and Mark Atwood. Atwood

told Hack that the auditors wanted four people terminated including Hack. Later that day a special meeting of the C-Plant Board of Directors was held. At this time, Atwood recommended firing the four employees listed by the NCUA examiner, which included Hack. The Board accepted this recommendation and on May 23, 2008, Hack, Kittle, Webb and Collins were terminated each being offered a severance package.

To date the position being held by Hack has not been filled. The Vice President of Business Services, James Johnston, has been performing Hack's duties. Johnston was sixty one years old at the time Hack was terminated.

Hack brought this action alleging that C-Plant violated the FMLA by interfering with his rights thereunder; violated the Kentucky Equal Opportunities Act ("KEOA") on account of his disability; violated the Kentucky Civil Rights Act on account of his disability and age; violated the Employee Retirement Income Security Act as amended by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"); and alleged that his termination by C-Plant was wrongful. Hack also alleged that Atwood intentionally interfered with his contractual relationships.

C-Plant now moves for summary judgment regarding each of the claims asserted against C-Plant. Atwood, in a separate motion, also moves for summary judgment of the claims asserted against him.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all

3

reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

As both defendants have moved for summary judgment separately, the Court will address them separately beginning with C-Plant's motion.

### I. C-Plant's Motion For Summary Judgment

C-Plant argues it is entitled to summary judgment as to Hack's following claims: Count 1, violation of FMLA; Count 2, violation of Kentucky 1976 Equal Opportunities Act for discrimination based on disability; Count 3, violation of Kentucky's Civil Rights Act for discrimination based on disability; Count 4, violation of the Kentucky Civil Rights Act for discrimination based on age; Count 5, violation of the Employee Retirement Income Security Act as amended by the

Consolidated Omibus Budget Reconciliation Act; and Count 6, wrongful discharge.

### A. Count 1: Violation of FMLA

In order to establish violation of the FMLA, a plaintiff must show:

> (1) []he was an eligible employee, (2) [the defendant] is a covered employer, (3) []he was entitled to leave under the FMLA, (4) []he gave [the defendant] notice of h[is] intent to take leave, and (5) [the defendant] denied h[is] FMLA benefits or interfered with FMLA rights to which []he was entitled.

*Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6 Cir. 2004). There is no dispute that, if the FMLA applies, Hack was an eligible employee. However, C-Plant asserts it was not a covered employer because it did not have more than fifty employees at the time of Hack's termination; that no notice of FMLA leave was provided; and Hack would have been terminated regardless of his leave.

Without determining whether C-Plant was a covered employer or whether Hack provided sufficient notice of leave, the Court finds Hack has failed to provide sufficient evidence he would not have been terminated regardless of his leave.

Case law makes clear that an employee may be lawfully terminated, thereby "preventing him from exercising his statutory rights to FLMA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th 2003). C-Plant asserts that Hack's termination was due to the NCUA report and issues with rolling due dates, not his surgery or leave. Hack argues there is a genuine issue of material fact as to whether or not he would have been terminated regardless of his leave.

Hack first states that as of May 13, 2008, the date his leave began, C-Plant had not decided to terminate his employment, although C-Plant had been aware of the amount of and concerns with

5

the rolling due dates for months prior to his leave. Hack references Atwood's testimony that Hack's performance evaluations were always satisfactory or higher and that Hack had done an outstanding job keeping the losses and delinquent loans to a minimum. Atwood's Answers to Admissions Nos. 6, 15, and 22. Hack also points to Atwood's testimony regarding the reason for Hack's termination. Atwood stated he was not sure the terminated employees were terminated for violating policies and procedures. Atwood Dep. 128:13-15; 129:4-9, March 16, 2009. Hack also points to evidence that there is a dispute between Atwood's testimony that the NCUA wanted Hack and the other employees fired and the testimony of the NCUA examiner, Shepard.

Hack reasons that "a reasonable juror could conclude that Mark Atwood terminated Mr. Hack's employment without justification, as Mr. Atwood did not believe Mr. Hack had violated any of C-Plant's policies or procedures, and Mr. Hack's termination could not have prevented C-Plant from providing a copy of the NCUA examination to its bonding company." The Court notes Hack was an at will employee who could be terminated for any reason, or no reason at all. *Grzyb v. Evans*, 700 S.W.2d 399, 400 (Ky. 1985); *Firestone Textile Co., Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). The only question is whether he was terminated because he took medical leave.

Hack goes on to state that the timing of the termination could lead the fact finder to infer that Hack would not have been fired absent the employee taking leave. The Seventh Circuit in *Kohls v. Beverly Enterprises Wisconsin, Inc.*, explained that there could be

> circumstances in which the timing of this decision [to terminate] could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).

259 F.3d 799, 806 (7th Cir. 2001). However, the fact finder is still free to recognize "that the

employee was discharged 'solely because of her work deficiencies known to defendants prior to her leave' [and] still find[] that 'plaintiff was discharged for poor performance rather than for taking a medical leave.'" *Id.* (quoting *Clay v. City of Chi. Dep't. of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998).

Kohls involved an employee who was terminated while on maternity leave. *Id.* at 805. Prior to her leave her employer had discovered evidence of mishandling or mismanagement of funds and poor performance. *Id.* However, the decision to fire the employee was not made until after she had taken leave. *Id.* The court noted that there were several deficiencies that were not discovered until after the employee's leave had begun. *Id.* at 806. The employee presented other reasons she thought she had been fired besides her performance; however, the court held "the employee's burden is to prove a violation of the FMLA. Thus, pretext may have evidentiary value, but showing pretext does not necessarily satisfy the employee's burden." *Id.* at 806. The court concluded "[the employer] has asserted that [the employee's] deficiencies were the reason for her termination and that she would have been terminated regardless of her leave, and [the employee] has not presented sufficient evidence for a fact finder to conclude otherwise." *Id.* at 807.

Here, similarly, Hack has not met his burden of establishing he was fired due to his taking leave. Although C-Plant may have known of some issues prior to his leave, the timing of his leave coincided with the timing of the NCUA evaluation and the exit interview with the NUCA examiner. While Hack has argued that there are other reasons than the rolling due dates or NCUA examination for his termination, none of these reasons relate to his medical leave and establish pretext only. For example, Hack testified he was terminated to provide job security for James Johnston. C-Plant, on the other hand, has presented sufficient evidence that Hack was terminated for the stated reasons.

7

C-Plant is entitled to summary judgment on Hack's claim for violation of the FMLA.

**B. Counts 2 and 3: Disability under Kentucky's 1976 Equal Opportunities Act and Kentucky Civil Rights Act**

### i. Kentucky Equal Opportunities Act

The Kentucky Equal Opportunities Act ("KEOA") prohibits an employer from discharging or discriminating against any individual based on the person's physical disability, unless the person's disability restricts the person's ability to perform the particular job or occupation for which he is eligible. Ky. Rev. Stat. Ann. §207.150(1). Physical disability is defined under the KEOA as "the physical condition of a person whether congenital or acquired, which constitutes a substantial disability to that person and is demonstrable by medically accepted clinical or laboratory diagnostic techniques." Ky. Rev. Stat. Ann § 207.130. There is very little case law in Kentucky interpreting the KEOA definition of disability. The Sixth Circuit, in an unpublished opinion, has made clear that the court may not supplant the language of the KEOA with that of the ADA. *Reid v. Contel Cellular of Louisville*, 96 F.3d 1448, 1996 WL 506372, (6th Cir. Sep. 4, 1996). In *Whitlow v. Kentucky Mfg. Co.*, the Kentucky Court of Appeals, noting there were no reported Kentucky decisions, held that a plaintiff must show first that he is a physically disabled person within the meaning of the Act, and second that he was discharged because of his physical disability. 762 S.W.2d 808, 809 (Ky. Ct. App. 1988). In *Whitlow*, the court held that the plaintiff's physical problems with coordination, vison and varicose veins did not render him physically handicapped for purposes of the Act. *Id.*

In *Burge v. PPG Industries, Inc.*, the court held the plaintiff who suffered from a hypersensitivity to aromatic hydrocarbons which caused him to have an allergic reaction when

exposed to paint fumes was not physically disabled within the meaning of the Act. Case No. 3:07-cv-246-H, 2008 WL 4386859 (W.D. Ky. Sept. 23, 2008). The court noted the plaintiff presented no evidence that this ailment constituted a substantial disability as required since the plaintiff could carry on normal activities such as bathing, doing chores, and engaging in normal relations with his family. *Id.* at *4.

In *Wells v. Huish Detergents, Inc.*, the court held that the plaintiff was not substantially disabled within the meaning of the statute. Case No. 1:98-cv-131-R,199 WL 33603335 (W.D. Ky. Nov. 30, 1999). The plaintiff had injured his knee during a fall at work and was later terminated. *Id.* at *1. The plaintiff alleged he was terminated in violation of the KEOA. *Id.* at *4. The court noted there was no evidence that the plaintiff missed excessive work due to his injury or that he considered himself seriously injured while he was working. *Id.* at *5. The court found that plaintiff had surgery for his knee injury and while he suffered some pain and discomfort he failed to present evidence that his injury was a substantial disability especially since he had moved into a more lucrative position and after surgery did not consider himself disabled. *Id.* at *5.

The Court finds Hack is not substantially disabled within the meaning of the KEOA. Hack argues that although he was only temporarily disabled he suffered a disability under the KEOA because his disability had a severe impact on his ability to care for himself, prevented him from driving for ten days, and limited his performance of routine tasks due to his inability to lift more than five pounds. Hack testified to the following limitations at his deposition:

> I couldn't lift anything over five pounds. I couldn't drive for, I think, ten days, and I was on pain medicine for the first week to ten days, whatever that was. I don't remember. But I couldn't get out. I was just at home, and when I did get out, it was hard. When I drove to the store and bought a case of that tea and, like I said, I picked it up at the store, and it wasn't a good deal.

9

Hack Dep. at 18:3-11

The Court believes this case is similar to that in *Wells*. Here, while Hack could have missed up to six weeks of work, there is no evidence he considered himself seriously injured and he testified that he could have continued to preform his job functions from home. Hack Dep. at 17:10-25. Hack also testified that he could have returned to work within the six week time frame and that there were no complications from the surgery. Hack Dep. at 100:5-15. There is no evidence of any long term complications as a result of the surgery. The Court notes that, as in *Wells*, while Hack had surgery and suffered pain, discomfort and limitations on his activities for a period of time, there is no evidence he now considers himself disabled. Nor is there evidence that he was unable to carry on normal activities such as bathing, doing chores, or engaging in normal relations with his family. Hack Dep. at 18:3-11. Based on the limited case law available, the Court finds Hack was not disabled within the meaning of the KEOA. Although Hack may have been limited in his activities for a period of a few weeks, this does not amount to a "substantial disability" within the meaning of the KEOA.

### ii. Kentucky Civil Rights Act

Similarly to the KEOA, the Kentucky Civil Rights Act ("KCRA") prohibits discrimination on the basis of disability stating it is unlawful for an employer to discriminate against an individual who is "a qualified individual with a disability." Ky. Rev. Stat. Ann. § 344.040. In order to establish a prima facie case of discrimination based on disability under the KCRA, a plaintiff must show

> (1) that he had a disability as that term is used under the statute (i.e., the Kentucky Civil Rights Act in this case); (2) that he was "otherwise qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability.

*Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. Ct. App. 2004).

C-Plant first argues Hack has failed to show that he had a disability as defined by the KCRA. The KCRA defines disability as

> (a) A physical or mental impairment that substantially limits one or more of the major life activities of the individual;
> (b) A record of such an impairment; or
> (c) Being regarded as having such an impairment.

Ky. Rev. Stat. Ann. § 344.010(4). The language of the KCRA mirrors the language of the Americans with Disabilities Act ("ADA"), therefore the Court may analyze a claim under the KCRA guided by the ADA. *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th Cir. 1998). Taking the first element, it appears the plaintiff must establish three sub-elements: (1) that he has a physical or mental impairment (2) that substantially limits (3) one or more major life activities. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).

Assuming *arguendo* Hack had a physical impairment, there is dispute about whether it substantially limited one or more major life activities.[1] The regulatory definition states that one is substantially limited when one is

> unable to perform a major life activity that the average person in the general population can perform; or [is] significantly restrict[ed] as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. §1620.2(j). There are several factors which may be considered when determining whether a major life activity is substantially limited, including (1) the nature and severity of the impairment;

---

[1] The Court notes that generally whether the plaintiff has an impairment and whether the impairment affected a major life activity are legal questions. *Hallahan*, 138 S.W.3d at 707. The determination of whether the impairment substantially limits the major life activity is usually an issue of fact for the jury. *Id.* However, in some circumstances it is appropriate for the court to decide the issue on summary judgment. *Id.*; *Doebele*, 342 F.3d at 1130. The Court finds that it is appropriate in this case since the issue of duration has been decided so clearly by the Sixth Circuit.

11

(2) the duration or expected duration of the impairment; (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Id.*

Here, there is not significant evidence of the severity of the impairment; however, taking the facts in the light most favorable to Hack the Court finds the impairment was severe. As to the third factor, Hack testified there were no complications in his recovery from the surgery. Hack Dep. at 100:11-15. There is no further evidence of any permanent or long term impact from the hernia or the surgery. The remaining factor is the duration of the impairment. Hack argues that although it was short-term his impairment was substantially limiting, while C-Plant argues the short-term nature of the impairment means it was not substantially limiting.

The Court finds, even if Hack were able to establish an impairment and a major life activity which was limited by this impairment, the major life activity could not be considered substantially limited as required by the statute due to the relatively short duration of the impairment. The Sixth Circuit has consistently held that an employee with a temporary injury or impairment is not considered disabled pursuant to the ADA. For example, in *Ferrette v. Cuyahoga County Board of Elections*, the court held that an employee was not disabled even though she was substantially limited in performing a major life activity, speaking, after surgery for mouth cancer. 105 Fed. App'x 722, 727 (6th Cir. 2004). The court noted that she was able to speak after a short period of time and there was no evidence that she could not speak at the time she was terminated. *Id.* In *Curry v. Cyprian Center*, the Sixth Circuit affirmed a district court's grant of summary judgment on the basis that "temporary conditions do not constitute disabilities under the ADA." 17 Fed. App'x 339, 340 (6th Cir. 2001); *see also Nasser v. City of Columbus*, 92 Fed. App'x 261, 263 (6th Cir. 2004) (concluding an employee was not disabled for purposes of ADA when he testified that his back

injury was temporary).

Due to the undisputed temporary nature of Hack's alleged impairment C-Plant is entitled to judgment as a matter of law on Hack's claim for violation of KCRA. Summary judgment is granted as to this claim.

### C. Count 4: Age Discrimination under Kentucky Civil Rights Act

Hack concedes in his response that "[t]he evidence of record has established that James Johnston assumed the duties of Mr. Hack after his termination, and Mr. Johnston is in fact, older than the plaintiff. Therefore, C-Plant is entitled to summary judgment on the plaintiff's age discrimination claim brought under the Kentucky Civil Rights Act." The Court will therefore grant summary judgment in favor of C-Plant as to this claim and it will be dismissed.

### D. Count 5: COBRA Benefits

Hack alleges in his complaint that C-Plant violated the Consolidated Omnibus Reconciliation Act ("COBRA") amendment to the Employee Retirement Income Security Act ("ERISA") by failing to provide Hack notice of his right to continue health coverage benefits within fourteen days of his termination, if C-Plant was a plan administrator. Hack further alleges that if C-Plant was not the plan administrator C-Plant still violated COBRA by failing to provide notice of a qualifying event to the plan administrator within 30 days of Hack's termination. C-Plant argues that Hack was timely notified, as was the plan administrator, and that Hack was paid an additional month of health benefits before receiving his rightful COBRA benefits.

COBRA provides that an employer that sponsors a group health insurance plan must offer employees and qualified beneficiaries the opportunity to continue their health insurance coverage at the group rate, but at their own expense, for at least eighteen months after the occurrence of a

13

qualifying event and notice to the affected employee. *See* 29 U.S.C. §§ 1161-68. COBRA requires an employer of an employee under the plan to notify the plan administrator of a qualifying event within 30 days of the date of the qualifying event. 29 U.S.C. § 1166(a)(2). A qualifying event includes the termination of a covered employee. 29 U.S.C. § 1163(2). The record reflects C-Plant sent its COBRA Coverage Continuation Notice on June 25, 2008. Therefore, C-Plant provided notice to its plan administrator 33 days after the qualifying event on May 25, 2008. The record further reflects this notice was pulled and resent on July 1, 2008, 39 days after the qualifying event.

C-Plant argues that Hack was provided health coverage until June 30, 2008, over a month after his termination, and was notified after his coverage ended of his rights to COBRA coverage which benefits he fully received. Hack argues C-Plant's voluntary continuation of insurance coverage does not relieve C-Plant's duty to notify the plan administrator within 30 days of the qualifying event, i.e., his termination.

The plain language of the statute requires C-Plant to provide notice to the plan administrator within 30 days of the qualifying event. 29 U.S.C. § 1166(a)(2); *see also Gaskell v. Harvard Co-op. Soc.*, 3 F.3d 495 (1st Cir. 1993). The only exception to this requirement can be found in section 1167 which states that the plan may allow the period of notice to begin on the date of loss of coverage, rather than the date of the qualifying event. 29 U.S.C. § 1167(5). It is clear from the record that notice was not provided within the usual 30 day time period and the plan is not of record before the Court.

Hack asserts C-Plant is subject to civil penalties for its alleged violation. As stated, COBRA requires that after the occurrence of a qualified event, such as termination, the employer must notify the plan administrator within 30 days. 29 U.S.C. §1166(a)(1). The plan administrator is then under

14

a duty to notify the discharged employee and other qualified beneficiaries of their COBRA rights within 14 days. 29 U.S.C. § 1166(a)(4) and (c). When the employer is also the administrator of the plan, the administrator must provide notice within 44 days. 29 C.F.R. § 2590.606- 4(b)(2). Pursuant to 29 U.S.C. § 1132(c), a plan administrator who fails to notify a qualifying beneficiary within 14 days of the date of its notification of a qualifying event may be liable in the amount of up to $100 a day from the date of such failure. These penalties have previously been awarded from the last date on which the administrator could have sent notice until the end of the coverage continuation period. *Lloynd v. Hanover Foods Corp.*, 72 F.Supp.2d 469, 480 (D.Del. 1999). The coverage continuation period is eighteen months following the termination. 29 U.S.C. § 1162(2)(A)(i).

Hack alleged in his Complaint that C-Plant was the plan administrator; however, the record now reflects that C-Plant was not the plan administrator but that USAdmin Services, LLC, was the plan administrator. The Court was unable to find case law where an employer has been held liable under 29 U.S.C. § 1132(c) when they were not also the plan administrator.[2]

Assuming, *arguendo*, C-Plant may be liable for civil penalties as argued by Hack, the Court finds civil penalties are inappropriate and unavailable in this case. The Sixth Circuit in *Bartling v. Fruehauf Corp.*, adopted the premise that penalties should not be imposed in the absence of prejudice to the employee or bad faith on the part of the employer. 29 F.3d 1062, 1068-69 (6th Cir. 1994) (citing *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 588-89 (1st

---

[2] The Court observes that the Sixth Circuit in *McDowell v. Krawchinson*, specifically noted that the employer was not liable for failure to notify since the employer was not the plan administrator. 125 F.3d 954, 963 (6th Cir. 1997); *see also Vincent v. Wells Fargo Guard Services, Inc.*, 44 F.Supp.2d 1302, 1305 (S.D.Fla. 1999) (noting an employer is not liable by specifically stating "Had Congress permitted civil penalties against employers for failure to comply with 29 U.S.C. § 1166(a)(2), imposition of a penalty would be particularly appropriate in this case where there was approximately a one-year delay in notifying the plan administrator of a qualifying event.").

Cir.1993); *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 328-29 (5th Cir.1992)).

C-Plant asserts, and Hack does not dispute, that Hack received all COBRA benefits to which he was entitled and was provided an additional month of coverage voluntarily by C-Plant. Therefore, no prejudice was suffered by Hack due to the delay in notice. Hack appears to argue that Human Resources Director Jennifer Brayboy's pulling of the continuation notice after it was initially filed is evidence of C-Plant's bad faith. The email sent from Brayboy to the plan administrator states "we are still in the process of negotiations, therefore it does not need to go (we are not cancelling insurance at this time)." It should be noted the second filing was amended to reflect the date of loss of coverage, June 30, 2008, rather than May 31, 2008 as noted on the previous filing. This document reflects not bad faith, but a mistaken belief that the notice was due based on the date of loss of coverage rather than the date of the qualifying event. The Court concludes C-Plant is entitled to judgment as a matter of law as to Hack's claim for violation of COBRA.

### E. Count 6: Wrongful Discharge

Hack states in his response he does not oppose the Court granting summary judgment in favor of C-Plant as to this claim. Therefore, the Court will grant summary judgment in favor of C-Plant as to this claim and it will be dismissed.

### II. Atwood's Motion for Summary Judgment

Defendant Atwood has moved for summary judgment on each count of Hack's Complaint. Hack has stated in his response that summary judgment for Counts 1 through 6 are unopposed as only Count 7, intentional interference with a contractual relationship, was brought against Atwood in his individual capacity. Therefore, the Court will dismiss counts 1 through 6 and will only discuss the arguments related to Count 7.

Under Kentucky law, to recover under tort of intentional interference with contractual relations, a plaintiff must prove the following elements: "(1) the existence of a contract; (2) [the defendant's] knowledge of this contract; (3) that [the defendant] intended to cause its breach; (4) [the defendant's] conduct caused the breach; (5) this breach resulted in damages to [the plaintiff]; and (6) [the d]efendant had no privilege or justification to excuse [his] conduct." *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1079 (W.D.Ky. 1995); *Carmichael-Lynn-Nolan v. Bennett*, 561 S.W.2d 99 (Ky. Ct. App.1978).

Hack alleges in his Complaint that defendant Atwood requested Hack commit acts which led to Hack's termination which termination interfered with Hack's contracts for health insurance coverage, for membership fees to the Rolling Hills County Club, and for cellular phone service. These services were provided by C-Plant during Hack's employment. Hack argues the first five elements are established and there remains a genuine issue of material fact regarding whether Atwood was privileged or justified in his conduct.

C-Plant first argues that Hack has not established that Atwood had the requisite intent to interfere with these contracts. C-Plant next asserts Hack was not a party to any of these contracts, instead it was C-Plant who entered these contracts. C-Plant further argues that termination of Hack provided justification for allegedly interfering with these contracts as Hack was no longer entitled to the benefits of the contracts after his termination, i.e., these benefits went hand-in-hand with Hack's at will employment and ended upon termination. C-Plant also asserts there is no evidence of breach of these contracts by the insurance company, country club, or cellular phone service.

Hack is required to present more than a mere scintilla of evidence in order to survive a well supported motion for summary judgment. Hack has not met this burden with regard to at least one

of the required elements: intent to cause breach of the contract. Hack states in his response Atwood knew Hack would lose the benefits provided under the contracts at issue after he was terminated therefore the intent element had been met. There is no evidentiary support provided that Atwood intended to interfere with Hack's alleged contracts for health insurance coverage, for membership fees to the Rolling Hills County Club, and for cellular phone service. At most Hack has alleged Atwood intended to interfere with Hack's employment relationship which is not actionable since there is no employment contract.

Furthermore, Hack has presented no evidence to the Court that either the insurance company, the country club, or the cellular phone service breached their contracts. As far as the Court is aware the contracts, which have not been provided to the Court, continue between these vendors and C-Plant. While Hack may no longer enjoy the benefits of these contracts as he is no longer an employee of C-Plant, that does not mean there was interference with a contractual relationship. Hack's relationship with these vendors was based upon his status as a C-Plant employee and because that status has changed, so has the contractual relationship.

Atwood is entitled to summary judgment as to Hack's claim for intentional interference with a contractual relationship.

## CONCLUSION

For the foregoing reasons, Defendant C-Plant's and Defendant Atwood's motions are GRANTED. All claims against Defendant C-Plant will be dismissed. C-Plant's counterclaim against Hack remains, as well as Hack's counterclaim against Atwood. An appropriate order shall issue.